**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| APRYL GONZALEZ, SHAWN GREINER, CHARLES JOHNS, ANNA JOHNS, PAUL WYNN, LYDIA LANGHAM, and JARED GLENN, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>VOLKSWAGEN GROUP OF AMERICA, INC., a New Jersey corporation, and VOLKSWAGEN AG, a German corporation,<br><br>Defendants. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Apryl Gonzalez, Shawn Greiner, Charles Johns, Anna Johns, Paul Wynn, Lydia Langham, and Jared Glenn (collectively, "Plaintiffs"), individually and on behalf of all similarly situated persons in the United States (the "Class" or "Class Members," as defined below), upon personal knowledge of the facts pertaining to them and on information and belief as to all other matters, by and through their undersigned counsel, hereby bring this Class Action Complaint against Defendants Volkswagen Group of America, Inc. ("VWGOA") and Volkswagen AG ("VWAG") (collectively, "Defendants" or "Volkswagen").

## INTRODUCTION

1. Plaintiffs bring this action individually, and on behalf of the Class Members, for the benefit and protection of purchasers and lessees of 2021–2023 model year Volkswagen Atlas and Volkswagen Atlas Cross Sport vehicles ("Class Vehicles" or "Vehicles").[1]

2. As alleged herein, the Class Vehicles are defective and unsafe. The Vehicles have a defect involving premature failure of their LED daytime running lights ("DRLs"). The DRLs are an important safety feature that studies show decrease the frequency of opposite-direction crashes.

3. Plaintiffs and Class Members have experienced the failure of the DRLs on one or both sides of their Class Vehicles, often when the Vehicles reach approximately 50,000 miles (the "Defect").

4. Instead of traditional bulbs, the DRLs equipped in the Class Vehicles are LED strips that are integrated into the headlight housing. Unlike traditional bulbs, these strips cannot be individually replaced; replacing them requires replacing the entire headlight assembly.

5. As Volkswagen's standard New Vehicle Limited Warranty covers vehicles for four-years/50,000 miles, this failure often occurs right as the Vehicle

[1] Plaintiffs reserve the right to amend or add to the vehicle models and model years included in the definition of Class Vehicles after conducting discovery.

comes out of warranty. Even when the Vehicles are still under warranty, Plaintiffs and Class members have experienced dealerships charging them out of pocket to replace the assembly.

6. The failure of DRLs is a major safety concern. The DRLs are an important safety feature intended to reduce crashes by increasing the contrast between vehicles and the background.[2] One retrospective study done on DRLs in the United States found that the crash rate among vehicles without standard DRLs was 1.73 higher than for vehicles equipped with standard DRLs.[3] The premature failure of DRLs thus increases an individual's risk of experiencing a crash and decreases the Vehicle's safety.

7. Plaintiffs' investigation of the Defect is ongoing, and the root cause of the Defect will be ascertained during discovery, but upon information and belief, the Defect manifests due to a defect in the DRLs installed in the Class Vehicles.

8. Defendants are and have been aware of the Defect. Defendants have received National Highway Traffic Safety Administration ("NHTSA") complaints regarding the premature failure of the DRLs. Despite knowing of the Defect,

---

[2] Michele E. Krajicek & Raquel M. Schears, *Daytime Running Lights in the USA: What Is the Impact on Vehicle Crashes in Minnesota?* 3 INT'L J. EMERGENCY MED. 39 (2010), https://pmc.ncbi.nlm.nih.gov/articles/PMC2850978/#.

[3] *Id.*

Defendants have failed to provide adequate repairs and have continually sold the Class Vehicles without disclosing this known Defect to purchasers.

9. Defendants have been aware of the Defect for years, including prior to sale of the Class Vehicles, as evidenced by the large number of owners and lessees who have complained about this Defect, including when consumers brought their Class Vehicles to Defendants' authorized dealerships for repairs.

10. Defendants also knew about the Defect based upon rigorous and extensive pre-sale testing of the Vehicles, which replicates actual consumer use of the Vehicles. Because of the ubiquitous nature of the Defect in the Class Vehicles, Defendants' pre-sale testing of the Vehicles would have revealed the Defect to them.

11. Despite Defendants' knowledge of the Defect, which renders the Class Vehicles hazardous and unsuitable for their intended purpose, they have failed to provide adequate repairs and have failed to disclose the Defect to unsuspecting purchasers and lessees. Although the Defect presents a clear safety hazard, Defendants have also failed to issue a recall and adequately address the Defect.

12. As a result of the Defect, Plaintiffs and Class Members are unable to utilize their Vehicles as advertised, and in a safe manner, and have incurred damages. Specifically, Plaintiffs and Class Members were each injured on account of receiving Vehicles that were less valuable than what was represented. Plaintiffs and Class Members did not get the benefit of their bargains, experienced diminution in the value

of their Vehicles, and sustained losses in the form of other out-of-pocket costs incurred that are related to the Defect. These consumers continue to live with the risks of their DRLs failing while they are operating their Vehicles, costly replacements, loss of use of their Class Vehicles, and out of pocket expenses.

13. To redress these and other harms, Plaintiffs bring claims for violations of Georgia, Texas, and Virginia consumer protection statutes, breaches of express and implied warranties, common law fraud and fraudulent concealment, and unjust enrichment.

14. The allegations herein are based on personal knowledge as to Plaintiffs' own experiences and are made as to other matters on information and belief based on an investigation by counsel, including analysis of publicly available information.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

16. Venue properly lies in this judicial District pursuant to 28 U.S.C. § 1391 because Defendants transact business in this district and are subject to personal jurisdiction in this District and, therefore, are deemed to be citizens of this District. Additionally, Defendants have advertised in this District and have received substantial revenue and profits from their sales and/or leasing of Class Vehicles in this District; therefore, a substantial part of the events and/or omissions giving rise to the claims herein occurred, in part, within this District.

17. This Court has personal jurisdiction over Defendants because they are incorporated in this District, have conducted substantial business in this judicial District, and intentionally and purposefully placed Class Vehicles into the stream of commerce within this District and throughout the United States.

## PARTIES

***Plaintiff Apryl Gonzalez***

18. Plaintiff Apryl Gonzalez is a citizen and resident of Texas.

19. In 2021, Plaintiff Gonzalez purchased a 2021 Volkswagen Atlas from Garlyn Shelton Volkswagen, an authorized dealership located in Temple, Texas.

20. Plaintiff Gonzalez purchased this vehicle for personal, family, or household use. At all relevant times, Plaintiff Gonzalez has used the Class Vehicle in the normal and expected manner in which it was intended to be used and has driven her Class Vehicle in a foreseeable manner.

21. Passenger safety and reliability were important factors in Plaintiff Gonzalez's decision to purchase the Vehicle. Plaintiff Gonzalez selected and ultimately purchased the Vehicle because it was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation. The purchase was made, in part, on the advertised safety, reliability, and quality of the vehicle and its components, including its standard safety features such as DRLs.

22. None of the information provided to Plaintiff Gonzalez disclosed any defects with the DRLs. Had Defendants disclosed the Defect before Plaintiff Gonzalez purchased the vehicle, Plaintiff Gonzalez would have seen such disclosures and been aware of them. Indeed, Defendants' misstatements and omissions were material to Plaintiff Gonzalez. Like all members of the Class, Plaintiff Gonzalez would not have purchased her Class Vehicle, or would have paid less for the vehicle, had she known of the Defect.

23. In addition, at the time Plaintiff Gonzalez purchased her vehicle, and in purchasing her Vehicle, she relied upon representations from Defendants and their authorized dealership that the Vehicle was fully functional, safe, durable, and reliable. Plaintiff relied on those representations in purchasing the Vehicle, and absent those representations and omissions, would not have purchased the Vehicle or would have paid less for it.

24. At all relevant times, Plaintiff Gonzalez has properly maintained and serviced the Class Vehicle according to Defendants' recommended maintenance guidelines.

25. In 2023, with less than 35,000 miles on the Vehicle, the DRL on the passenger side of Plaintiff Gonzalez's Vehicle failed.

26. On August 31, 2023, Plaintiff Gonzalez took the Vehicle to Payne Mission Volkswagen, an authorized dealership in Mission, Texas, and was informed by a service technician that in order to replace the DRLs, the entire headlight assembly would need to be replaced. The technician also stated that the headlight assembly replacement cost in excess of $1,000 when the vehicle is outside of the warranty period. Payne Mission replaced both the passenger and driver side headlight assemblies without cost to Plaintiff Gonzalez.

27. In the fall of 2024, with a little over 50,000 miles on the Vehicle, the DRL on the passenger side of Plaintiff's Vehicle failed again. Because the Defect is inherent in the DRLs, the replacement DRLs suffer from the same Defect as the original and also failed prematurely.

28. Plaintiff Gonzalez had communications with the technicians at Payne Mission Volkswagen but declined the replacement due to the cost. Plaintiff Gonzalez currently drives without a properly functioning DRL.

29. Based on what Plaintiff Gonzalez has learned regarding the premature failure of the DRLs, Plaintiff Gonzalez anticipates that the DRL on the driver side of the Vehicle will also fail prematurely, requiring an additional cost for replacement.

30. As a result of the Defect, Plaintiff Gonzalez has lost confidence in the ability of the Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Until and unless Defendants fully disclose the Defect, a permanent repair or modification, and/or a change to the maintenance schedule to prevent the Defect from causing harm, Plaintiff Gonzalez will be unable to rely on future advertising or labeling of the Class Vehicles, and so will not purchase another Class Vehicle or Defendants' other vehicles, although Plaintiff Gonzalez would like to do so.

31. Additionally, as a result of the Defect, Plaintiff has lost time dealing with the Defect and experienced loss of use of her vehicle and lost time. Plaintiff's vehicle has also suffered diminution in value due to the Defect and loss of resale value.

32. On December 19, 2025, through counsel, Plaintiff Gonzalez served Defendants with a pre-suit notice letter informing them of claims on behalf of Plaintiff Gonzalez and other similarly situated consumers for breach of express and implied warranties and violation of consumer protection statutes, and demanding relief.

***Plaintiff Shawn Greiner***

33. Plaintiff Shawn Greiner is a citizen and resident of Georgia.

34. In or around September 2022, Plaintiff purchased a used 2021 Volkswagen Atlas from Rick Case Mazda in Duluth, Georgia.

35. Plaintiff Greiner purchased this vehicle for personal, family, or household use. At all relevant times, Plaintiff Greiner has used the Class Vehicle in the normal and expected manner in which it was intended to be used and has driven his Class Vehicle in a foreseeable manner.

36. Passenger safety and reliability were important factors in Plaintiff Greiner's decision to purchase the Vehicle. Plaintiff Greiner selected, and ultimately purchased, the Vehicle because it was represented to be and was marketed as a high-quality vehicle capable of providing safe, reliable transportation. The purchase was made, in part, on the advertised safety, reliability, and quality of the vehicle and its components, including its standard safety features such as DRLs.

37. None of the information provided to Plaintiff Greiner disclosed any defects with the DRLs. Had Defendants disclosed the Defect before Plaintiff Greiner purchased the vehicle, Plaintiff Greiner would have seen such disclosures and been aware of them. Indeed, Defendants' misstatements and omissions were material to Plaintiff Greiner. Like all members of the Class, Plaintiff Greiner would not have

purchased his Class Vehicle, or would have paid less for the Vehicle, had he known of the Defect.

38. In addition, at the time Plaintiff Greiner purchased his Vehicle, and in purchasing his vehicle, he relied upon representations from Defendants and their authorized dealership that the vehicle was fully functional, safe, durable, and reliable. Plaintiff Greiner relied on those representations in purchasing the Vehicle and, absent those representations and omissions, would not have purchased the Vehicle or would have paid less for it.

39. At all relevant times, Plaintiff Greiner has properly maintained and serviced the Class Vehicle according to Defendants' recommended maintenance guidelines.

40. In or around June 2025, with approximately 44,000 miles on the Vehicle, Plaintiff Greiner's DRLs on both sides of the Vehicle failed.

41. Plaintiff Greiner made an appointment at and presented his Vehicle to AutoNation Volkswagen Mall of Georgia, an authorized dealer in Buford, Georgia, for a repair. Plaintiff Greiner was told, even before his Vehicle was docked, that the dealership was aware of the issue impacting the DRLs and that it would cost approximately $3,000 to replace the light assembly on both sides. Plaintiff Greiner declined the replacement.

42. Because the Defect is inherent in the DRLs and the replacement DRLs suffer from the same Defect as the original, Plaintiff anticipates the replacement DRLs would also fail prematurely.

43. As a result of the Defect, Plaintiff Greiner has lost confidence in the ability of the Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Until and unless Defendants fully disclose the Defect, a permanent repair or modification, and/or a change to the maintenance schedule to prevent the Defect from causing harm, Plaintiff Greiner will be unable to rely on future advertising or labeling of the Class Vehicles, and so will not purchase another Class Vehicle or Defendants' other vehicles, although Plaintiff Greiner would like to do so.

44. Additionally, as a result of the Defect, Plaintiff Greiner has lost time dealing with the Defect, and his vehicle has also suffered diminution in value due to the Defect and loss of resale value.

45. On December 19, 2025, through counsel, Plaintiff Greiner served Defendants with a notice letter informing them of claims on behalf of Plaintiff Greiner and other similarly situated consumers for breach of express and implied warranties and violation of consumer protection statutes, and demanding relief.

***Plaintiffs Anna Johns and Charles Johns***

46. Plaintiffs Anna Johns and Charles Johns are citizens and residents of Virginia.

47. On June 26, 2021, Plaintiffs purchased a 2021 Volkswagen Atlas from Volkswagen of Winchester, an authorized dealership located in Frederick County, Virginia.

48. Plaintiffs purchased this vehicle for personal, family, or household use. At all relevant times, Plaintiffs have used the Class Vehicle in the normal and expected manner in which it was intended to be used and have driven their Class Vehicle in a foreseeable manner.

49. Passenger safety and reliability were important factors in Plaintiffs' decision to purchase the Vehicle. Plaintiffs selected, and ultimately purchased, the Vehicle because it was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation. The purchase was made, in part, on the advertised safety, reliability, and quality of the Vehicle and its components, including its standard safety features such as DRLs.

50. None of the information provided to Plaintiffs disclosed any defects with the DRLs. Had Defendants disclosed the Defect before Plaintiffs purchased the Vehicle, Plaintiffs would have seen such disclosures and been aware of them. Indeed, Defendants' misstatements and omissions were material to Plaintiffs. Like all

members of the Class, Plaintiffs would not have purchased their Class Vehicle, or would have paid less for the Vehicle, had they known of the Defect.

51. In addition, at the time Plaintiffs purchased their Vehicle, and in purchasing their vehicle, they relied upon representations from Defendants and their authorized dealership that the Vehicle was fully functional, safe, durable, and reliable. Plaintiffs relied on those representations in purchasing the Vehicle and, absent those representations and omissions, would not have purchased the Vehicle or would have paid less for it.

52. At all relevant times, Plaintiffs have properly maintained and serviced the Class Vehicle according to Defendants' recommended maintenance guidelines.

53. In or around August 2025, with approximately 25,000 miles on the Vehicle, Plaintiffs' DRL on the passenger side of the Vehicle failed.

54. Plaintiffs called and spoke with a customer representative at Volkswagen and were instructed to take their Vehicle to an authorized dealership for diagnosis. When Plaintiffs took their Vehicle to Checkered Flag Volkswagen, an authorized dealership in Virginia Beach, Virginia, for diagnosis, they were informed that the dealership charges a diagnostic fee of $211 and over $1,000 for the replacement headlight assembly. Plaintiffs declined the replacement due to the anticipated cost. Based on what Plaintiffs have learned regarding the premature failure of the DRLs, Plaintiffs anticipate that the DRL on the driver side of the Vehicle will also fail

prematurely, requiring an additional cost for replacement. Further, because the Defect is inherent in the DRLs and the replacement DRLs suffer from the same Defect as the original, Plaintiffs anticipate the replacement DRLs would also fail prematurely.

55. As a result of the Defect, Plaintiffs have lost confidence in the ability of the Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Until and unless Defendants fully disclose the Defect, a permanent repair or modification, and/or a change to the maintenance schedule to prevent the Defect from causing harm, Plaintiffs will be unable to rely on future advertising or labeling of the Class Vehicles, and so will not purchase another Class Vehicle or Defendants' other vehicles, although Plaintiffs would like to do so.

56. Additionally, as a result of the Defect, Plaintiffs have lost time and their Vehicle has also suffered diminution in value due to the Defect and loss of resale value.

57. On December 19, 2025, through counsel, Plaintiffs served Defendants with a pre-suit letter informing them of claims on behalf of Plaintiffs and other similarly situated consumers for breach of express and implied warranties and violation of consumer protection statutes, and demanding relief.

***Plaintiff Paul Wynn***

58. Plaintiff Paul Wynn is a citizen and resident of Alabama.

59. In or around April 2023, Plaintiff Wynn purchased a new 2023 Volkswagen Atlas from Royal Volkswagen, an authorized Volkswagen dealership located at 3010 Columbiana Road, Vestavia Hills, Alabama 35216.

60. Plaintiff Wynn purchased this vehicle for personal, family, or household use. At all relevant times, Plaintiff Wynn has used the Class Vehicle in the normal and expected manner in which it was intended to be used and has driven the Class Vehicle in a foreseeable manner.

61. Passenger safety and reliability were important factors in Plaintiff Wynn's decision to purchase the Vehicle. Plaintiff Wynn selected, and ultimately purchased, the Vehicle because it was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation. The purchase was made, in part, on the advertised safety, reliability, and quality of the Vehicle and its components, including its standard safety features such as DRLs.

62. None of the information provided to Plaintiff Wynn disclosed any defects with the DRLs. Had Defendants disclosed the Defect before Plaintiff Wynn purchased the Vehicle, Plaintiff Wynn would have seen such disclosures and been aware of them. Indeed, Defendants' misstatements and omissions were material to Plaintiff Wynn. Like all members of the Class, Plaintiff Wynn would not have

purchased the Class Vehicle, or would have paid less for the Vehicle, had Plaintiff Wynn known of the Defect.

63. In addition, at the time Plaintiff Wynn purchased the Vehicle, and in purchasing the Vehicle, Plaintiff Wynn relied upon representations from Defendants and their authorized dealership that the Vehicle was fully functional, safe, durable, and reliable. Plaintiff Wynn relied on those representations in purchasing the Vehicle, and absent those representations and omissions, would not have purchased the Vehicle or would have paid less for it.

64. At all relevant times, Plaintiff Wynn has properly maintained and serviced the Class Vehicle according to Defendants' recommended maintenance guidelines. Plaintiff Wynn had all service performed through the dealership.

65. In or around October 2025, with approximately 55,000 miles on the Vehicle, Plaintiff Wynn's DRL on the passenger side of the Vehicle failed.

66. Plaintiff Wynn took the Vehicle to Royal Volkswagen, an authorized Volkswagen dealership. Plaintiff Wynn was informed that the cost of replacement would be in excess of $1,000.

67. Because the Vehicle was no longer under warranty, having run out of warranty at approximately 50,000 miles, Plaintiff Wynn was informed that the replacement would cost approximately $1,463. Plaintiff Wynn declined the replacement at his expense.

68. Based on what Plaintiff Wynn has learned regarding the premature failure of the DRLs, Plaintiff Wynn anticipates that, even if replaced, the DRLs on the Vehicle will fail prematurely, requiring an additional cost for replacement. Further, because the Defect is inherent in the DRLs, the replacement DRLs suffer from the same Defect as the original, and Plaintiff Wynn anticipates the replacement DRLs will also fail prematurely.

69. As a result of the Defect, Plaintiff Wynn has lost confidence in the ability of the Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Until and unless Defendants fully disclose the Defect, a permanent repair or modification, and/or a change to the maintenance schedule to prevent the Defect from causing harm, Plaintiff Wynn will be unable to rely on future advertising or labeling of the Class Vehicles, and so will not purchase another Class Vehicle or Defendants' other vehicles, although Plaintiff Wynn would like to do so.

70. Additionally, as a result of the Defect, Plaintiff Wynn has incurred out-of-pocket expenses to remedy the Defect, service costs, loss of use of the Vehicle, and lost time. Plaintiff Wynn's Vehicle has also suffered diminution in value due to the Defect and loss of resale value.

***Plaintiff Lydia Langham***

71. Plaintiff Lydia Langham is a citizen and resident of Texas.

72. In or around May 2024, Plaintiff Langham purchased a used 2022 Volkswagen Atlas from Brandon Tomes Volkswagen of McKinney, an authorized Volkswagen dealership located in McKinney, Texas.

73. Plaintiff Langham purchased this vehicle for personal, family, or household use. At all relevant times, Plaintiff Langham has used the Class Vehicle in the normal and expected manner in which it was intended to be used and has driven the Class Vehicle in a foreseeable manner.

74. Passenger safety and reliability were important factors in Plaintiff Langham's decision to purchase the Vehicle. Plaintiff Langham selected and ultimately purchased the Vehicle because it was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation. The purchase was made, in part, on the advertised safety, reliability, and quality of the Vehicle and its components, including its standard safety features such as DRLs.

75. None of the information provided to Plaintiff Langham disclosed any defects with the DRLs. Had Defendants disclosed the Defect before Plaintiff Langham purchased the Vehicle, Plaintiff Langham would have seen such disclosures and been aware of them. Indeed, Defendants' misstatements and omissions were material to Plaintiff Langham. Like all members of the Class,

Plaintiff Langham would not have purchased the Class Vehicle, or would have paid less for the Vehicle, had Plaintiff Langham known of the Defect.

76. In addition, at the time Plaintiff Langham purchased the Vehicle, and in purchasing the Vehicle, Plaintiff Langham relied upon representations from Defendants and their authorized dealership that the Vehicle was fully functional, safe, durable, and reliable. Plaintiff Langham relied on those representations in purchasing the Vehicle, and absent those representations and omissions, would not have purchased the Vehicle or would have paid less for it.

77. At all relevant times, Plaintiff Langham has properly maintained and serviced the Class Vehicle according to Defendants' recommended maintenance guidelines.

78. In or around October 2025, with approximately 60,000 miles on the Vehicle, Plaintiff Langham's DRLs on both sides of the Vehicle failed.

79. Plaintiff Langham took the Vehicle to Brandon Tomes Volkswagen of McKinney, an authorized Volkswagen dealership. Plaintiff Langham was informed that the entire headlight assembly would need to be replaced.

80. Plaintiff Langham was informed that the replacement would cost approximately $1,800 per side. Plaintiff Langham declined the replacement at her expense.

81. Because the Defect is inherent in the DRLs and the replacement DRLs suffer from the same Defect as the original, Plaintiff Langham anticipates the replacement DRLs would also fail prematurely.

82. As a result of the Defect, Plaintiff Langham has lost confidence in the ability of the Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Until and unless Defendants fully disclose the Defect, a permanent repair or modification, and/or a change to the maintenance schedule to prevent the Defect from causing harm, Plaintiff Langham will be unable to rely on future advertising or labeling of the Class Vehicles, and so will not purchase another Class Vehicle or Defendants' other vehicles, although Plaintiff Langham would like to do so.

83. Additionally, as a result of the Defect, Plaintiff Langham has incurred out-of-pocket expenses to remedy the Defect, service costs, loss of use of the Vehicle, and lost time. Plaintiff Langham's Vehicle has also suffered diminution in value due to the Defect and loss of resale value.

***Plaintiff Jared Glenn***

84. Plaintiff Jared Glenn is a citizen and resident of Texas.

85. In or around September 2022, Plaintiff Glenn purchased a used 2021 Volkswagen Atlas from Silsbee Toyota, an authorized dealership located in Silsbee, Texas.

86. Plaintiff Glenn purchased this vehicle for personal, family, or household use. At all relevant times, Plaintiff Glenn has used the Class Vehicle in the normal and expected manner in which it was intended to be used and has driven the Class Vehicle in a foreseeable manner.

87. Passenger safety and reliability were important factors in Plaintiff Glenn's decision to purchase the Vehicle. Plaintiff Glenn selected, and ultimately purchased, the Vehicle because it was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation. The purchase was made, in part, on the advertised safety, reliability, and quality of the Vehicle and its components, including its standard safety features such as DRLs.

88. None of the information provided to Plaintiff Glenn disclosed any defects with the DRLs. Had Defendants disclosed the Defect before Plaintiff Glenn purchased the Vehicle, Plaintiff Glenn would have seen such disclosures and been aware of them. Indeed, Defendants' misstatements and omissions were material to Plaintiff Glenn. Like all members of the Class, Plaintiff Glenn would not have purchased the Class Vehicle, or would have paid less for the Vehicle, had Plaintiff Glenn known of the Defect.

89. In addition, at the time Plaintiff Glenn purchased the Vehicle, and in purchasing the Vehicle, Plaintiff Glenn relied upon representations from Defendants and their authorized dealership that the Vehicle was fully functional, safe, durable,

and reliable. Plaintiff Glenn relied on those representations in purchasing the Vehicle, and absent those representations and omissions, would not have purchased the Vehicle or would have paid less for it.

90. At all relevant times, Plaintiff Glenn has properly maintained and serviced the Class Vehicle according to Defendants' recommended maintenance guidelines.

91. In or around January 2026, with approximately 68,000 miles on the Vehicle, Plaintiff Glenn's DRLs on the passenger side of the Vehicle failed.

92. Plaintiff Glenn made an appointment with Silsbee Toyota, a repair facility located in Silsbee, Texas. Plaintiff Glenn was informed that the entire headlight assembly would need to be replaced.

93. Plaintiff Glenn was informed that the replacement would cost approximately $1,800 per side.

94. Based on what Plaintiff Glenn has learned regarding the premature failure of the DRLs, Plaintiff Glenn anticipates that the DRL on the opposite side of the Vehicle will also fail prematurely, requiring an additional cost for replacement. Further, because the Defect is inherent in the DRLs, the replacement DRLs suffer from the same Defect as the original, and Plaintiff Glenn anticipates the replacement DRLs will also fail prematurely.

95. As a result of the Defect, Plaintiff Glenn has lost confidence in the ability of the Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Until and unless Defendants fully disclose the Defect, a permanent repair or modification, and/or a change to the maintenance schedule to prevent the Defect from causing harm, Plaintiff Glenn will be unable to rely on future advertising or labeling of the Class Vehicles, and so will not purchase another Class Vehicle or Defendants' other vehicles, although Plaintiff Glenn would like to do so.

96. Additionally, as a result of the Defect, Plaintiff Glenn has incurred out-of-pocket expenses to remedy the Defect, service costs, loss of use of the Vehicle, and lost time. Plaintiff Glenn's Vehicle has also suffered diminution in value due to the Defect and loss of resale value.

***Defendants***

97. Defendant Volkswagen Group of America, Inc. ("VGA") is a New Jersey corporation with its principal place of business in Herndon, Virginia. VGA is a wholly owned North American subsidiary of Volkswagen AG ("VWAG") and is responsible for the operations of the Audi, Volkswagen, Bugatti, Lamborghini, and Bentley brands in the United States. VGA is engaged in the business of marketing, warranting, advertising, selling, and servicing Volkswagen-branded vehicles across the United States.

98. Defendant VWAG is a German corporation with its principal place of business located in Berliner Ring 2, 38440, Wolfsburg, Germany. VWAG's Wolfsburg headquarters include manufacturing plants, production facilities, warehouses, and administration buildings that employ thousands of VWAG employees.

99. Defendant VWAG designs, manufactures, and exports the Class Vehicles. Defendant VGA is responsible for Defendant VWAG's operations in the United States and imports, markets, distributes, sells, services, and repairs the Class Vehicles through its extensive network of authorized dealerships in the United States.

100. VGA has 626[4] authorized dealerships across the United States, which act as its agents and controls the distribution of automobiles, parts, services, and warranty repairs for Volkswagen-branded vehicles throughout the United States, all of which are under VGA's control. VGA authorizes these distributors and dealerships to sell Volkswagen-branded vehicles, parts, and accessories, and to service and repair Volkswagen-branded vehicles using Volkswagen parts.

---

[4] Volkswagen USA Dealership Locations, SCRAPEHERO, https://www.scrapehero.com/location-reports/Volkswagen-USA/ (last visited July 8, 2026).

101. The design, manufacture, distribution, service, repair, modification, and installation of the DRLs and other affected components within the Class Vehicles, were controlled exclusively by Defendants and their agents and affiliates.

102. There exists, and at all relevant times existed, a unity of ownership between VWAG and VGA, and their agents, such that any individuality or separateness between them has ceased and each of them is the alter ego of the others.

103. VWAG communicates with VGA concerning virtually all aspects of the Volkswagen products VGA distributes, sells, warrants, and services within the United States, including appropriate repairs for defects and whether Defendants will repair defective parts and assemblies.

104. Defendants develop sales and marketing materials, advertisements, owner's manuals, warranty booklets, and maintenance recommendations and schedules for the Class Vehicles, as well as the technical service bulletins ("TSBs") issued to authorized dealerships to address known defects.

105. Defendants also design, determine the substance of, and affix to Defendants' vehicles the window stickers visible on every new Volkswagen-branded vehicle offered for sale at their authorized dealerships. Defendants control the content of these "Monroney" stickers; their authorized dealerships have no input with respect to the content. Vehicle manufacturers like Defendants are legally required to affix a window sticker to every vehicle offered for sale in the United

States pursuant to the Automobile Information Disclosure Act of 1958, 15 U.S.C. §§ 1231, *et seq*.

106. Defendants engage in continuous and substantial business in the State of New Jersey.

## FACTUAL ALLEGATIONS

### A. The DRL Defect

107. The DRLs are an integral safety component on modern vehicles. According to a study conducted by the NHTSA, many traffic crashes are the result of the failure of a driver to notice another vehicle, and visual contrast is an essential characteristic that enables a driver to detect vehicles.[5]

108. The purpose of DRLs is to increase a driver's ability to detect oncoming vehicles by increasing visual contrast.[6] Several countries require the use of DRLs during all daytime periods, and studies from those countries support the fact that DRLs reduce the number of two-vehicle crashes during daylight, dusk, and dawn.[7]

---

[5] NAT'L CTR. FOR STATS. & ANALYSIS, NAT'L HIGHWAY TRAFFIC SAFETY ADMIN., *An Assessment of the Crash-Reducing Effectiveness of Passenger Vehicle Daytime Running Lamps (DRLs)*, DOT HS 809 760 (Sept. 2004).

[6] *Id*.

[7] *Id*.

109. The efficacy of DRLs has been studied since 1972, and the studies consistently demonstrate that DRLs increase driver safety. The NHTSA's 2004 study summarized the preceding studies on DRLs as follows:

| Year | Investigator(s) | Study Type | Country | Estimated Effects |
|---|---|---|---|---|
| 1972 | Anderson et al[1] | Law | Finland | 27% reduction rural multi-vehicle |
| 1975 | Attwood[3] | Fleet | Canada | 20% some defense vehicles |
| 1977 | Anderson et al[4] | Law | Sweden | 9% to 21% crash type dependent |
| 1985 | Stein[8] | Fleet | U.S. | 7% reduction selected vehicles |
| 1988 | Elvik[9] | Law | Norway | 15% reduction summer multi-vehicle |
| 1993 | Arora et al[10] | Law | Canada | 11.3% reduction 2-vehicle opposite-direction |
| 1993 | Hansen[11] | Law | Denmark | up to 37% reduction - crash type dependent |
| 1995 | Hollo[12] | Law | Hungary | 7% to 14% reduction frontal cross traffic |
| 1997 | Tofflemire et al[14] | Law | Canada | 5.3% reduction opposite direction/angle crashes |
| 1998 | Hollo[15] | Law | Hungary | 4.7% to 15.2% reduction frontal cross traffic |
| 2000 | Tessmer[16] | CC | U.S. | -8% to 29% crash type dependent |
| 2000 | Lau[17] | CC | U. S. | 5% to 13% reduction multiple vehicle crashes |
| 2002 | Farmer et al[18] | CC | U.S. | 3.2% decline in mult. vehicle daylight crashes |
| 2003 | Thompson[19] | CC | U.S. | 2.3% to 12.4% DRL type dependent |

110. In its 2004 study, the NHTSA found that using DRLs reduced daylight opposite-direction crashes by about 5%, reduced fatal opposite-direction crashes

between a motorcycle and a passenger vehicle by 23%, and reduced pedestrian/cyclist fatalities in single-vehicle crashes by more than 12%.[8]

111. Another retrospective study done on DRLs in the United States found that the crash rate among vehicles without standard DRLs was 1.73 higher than for vehicles equipped with standard DRLs.[9]

112. In light of the important role that DRLs play in the safety of both the driver and of those around them, the failure of DRLs creates a substantial safety hazard.

113. Unlike standard headlights, which are immediately evident when they fail to illuminate the road in front of the driver, DRLs may fail long before a driver is able to discover their failure. The sudden and premature failure of DRLs thus poses a problem that may not be discovered until it is too late.

114. When DRLs fail, the vehicle becomes less visible, particularly in low-light conditions such as dawn, dusk, or adverse weather, increasing the risk of crashes.

115. For a family-oriented SUV like the Atlas, this poses a significant safety hazard, as reduced visibility compromises the safety of occupants and other road users.

---

[8] *Id.*

[9] Krajicek & Schears, *supra* note 2, at 39.

116. Volkswagen Atlas and Atlas Sport Cross vehicles, from model years 2021–2023, are equipped with LED DRLs. Plaintiff and Class Members have experienced the premature failure of the LED DRL strips in their Vehicles.

117. Based on publicly available complaints, it appears the premature failure of the DRLs in the Class Vehicles generally occurs anywhere between 45,000 and 60,000 miles.

118. This is significantly shorter than the average lifespan of LED headlights. In general, if the headlights are in a housing designed for LEDs, and they have an adequate heat sink, modern LED headlights can last from 30,000 hours up to 50,000 hours, which equates to around 10 to 15 years for most drivers.[10] [11]

119. Several issues may result in LEDs not living up to their usual lifespan:

- The quality of the LED components such as the LED chip, driver, and cooling system, can affect longevity of LED bulbs.

---

[10] *How Long Do LED Headlights Last? Factors That Impact LED Lifespan,* ULTRA BRIGHT LIGHTZ (Jan. 6, 2025), https://ultrabrightlightz.com/blogs/ubl-insider/how-long-do-led-headlights-last?srsltid=AfmBOopR81t3JUkZ-8Z7pwsRxiXACrNzm2TDgXxkSaot6fmTMXYb3qHe (last visited July 8, 2026).

[11] Mark Yang, *5 Factors That Affect the Lifespan of LED Headlights*, CARLIGHTVISION (Mar. 26, 2025), https://carlightvision.com/blog/led-headlights-lifespan/.

- If there is not sufficient airflow around the heat sink, or if a vehicle experiences electrical fluctuations, inadequate heat dissipation can shorten LED lifespan.
- Degradation of the seal that houses the headlight assembly can lead to exposure of the elements, which can reduce the lifespan of LEDs.

120. However, key determinants of LED longevity include manufacturer and product quality.[12]

121. It is evident from the significantly reduced lifespan of the DRL LEDs in the Class Vehicles that Defendants either designed and manufactured the DRLs in a way that decreases longevity, or they used low-quality LEDs.

122. Since the LED DRL strips are integrated into the larger headlight assembly, when the LED DRL strips fail, the entire headlight assembly must be replaced. The cost of replacing a headlight assembly can cost anywhere from $1,000 to $2,300 per unit, as the LED strip is not separately serviceable.

**B. Defendants' Knowledge of the Defect**

123. Plaintiffs' experiences are not isolated or outlier occurrences. The internet is replete with driver complaints on message boards, social media, and other websites concerning the DRL Defect.

---

[12] *Id.*

124. Defendants had and have a duty to disclose the Defect due to, *inter alia*, their knowledge that the Defect affects the safety of Class Vehicles, their superior and exclusive knowledge of the Defect, and the fact that the Defect constitutes information reasonable consumers would want to know.

125. Numerous complaints about the Defect appear on websites that Defendants actively monitor, such as the website for the NHTSA, Volkswagen owner message boards, and social media. The following is a sampling of the NHTSA complaints submitted by Class Vehicle owners and lessees:

> NHTSA ID Number: 11554117
> Incident Date: October 24, 2023
> Model: 2021 Volkswagen Atlas
> Summary: LED daytime running lights went out a few weeks ago at the same time, then yesterday both headlights went out at the same time as well. There have been no damages or wrecks in my vehicle and I am the only owner. There are no warning lights and according to the MyVW app, everything is fine. I cannot see well while driving at night anymore and this will cost me $2,000 to replace at only 60,000 miles.

> NHTSA ID Number: 11601247
> Incident Date: June 1, 2024
> Model: 2021 Volkswagen Atlas Cross Sport
> Summary: One of my daytime running lights is out at 50k miles, thinking it was a simple solution I reached out to dealership and have been informed that the entire headlight needs to be replaced at a cost of $2k. Sound unreasonable considering this car is not old, and the way it has been built in makes it impossible to DIY. More than anything from research online it sounds like it is a common issue in Atlas 2021 and newer- Having to replace this every 50k miles is very unreasonable - and In my opinion beats the purpose of LED lights which are supposed to have a very long life. Please advise

NHTSA ID Number: 11605386
Incident Date: July 1, 2024
Model: 2021 Volkswagen Atlas Cross Sport
Summary: Hello, I am filing a complaint regarding a safety issue with my vehicle. The daytime running light has ceased functioning. It began dimming last week and is now completely out. The vehicle is available for inspection. Daytime running lights are essential for visibility during the day, contributing to overall safety and accident prevention. This problem appears to be common among VW Atlas owners after approximately 50,000 miles. The assembly has been examined, and since it cannot be disassembled, the issue is attributed to a faulty manufacturer component. The cost for a new part is approximately $1,200, not including labor. There were no warning lights or messages to indicate this malfunction, only the gradual dimming of the light before it failed entirely. Many users on online forums have reported experiencing the same issue. Please contact me if you need further details or have any questions about this safety hazard.

NHTSA ID Number: 11613213
Incident Date: September 7, 2024
Model: 2021 Volkswagen Atlas
Summary: Daytime running lights went out at around 72,000 miles.

NHTSA ID Number: 11622524
Incident Date: October 21, 2024
Model: 2022 Volkswagen Atlas
Summary: The contact owns a 2022 Volkswagen Atlas. The contact stated that upon starting the vehicle, the daytime running lights failed to illuminate. The vehicle was taken to a dealer where it was diagnosed and determined that the lights were not operating as designed. The contact was informed that the front driver's side headlight unit needed to be replaced. The headlight unit was replaced. The manufacturer was notified of the failure; however, no assistance was provided. The contact was referred to the dealer to pay for the repair. The vehicle was not repaired.
Additionally, the contact received notification on NHTSA Campaign Number: 24V464000 (AIR BAGS); however, the part to do the recall repair was not yet available. The contact stated that the manufacturer had exceeded a reasonable amount of time for the recall repair. The manufacturer was notified of the issue and confirmed that the part was

not yet available. The failure mileage was 56,000. VIN too confirms parts not available.

NHTSA ID Number: 11651574
Incident Date: March 30, 2025
Model: 2021 Volkswagen Atlas
Summary: The LED day time running lights have started to go out. They are completely out in the passenger side and one of the two out on the drivers side. Unsafe once all are out. These lights can not be replaced as the whole housing for 2k each side. So 4k to fix a safety issue of daytime running lights.

NHTSA ID Number: 11670669
Incident Date: July 1, 2025
Model: 2021 Volkswagen Atlas
Summary: The daytime running lights went out at 45,500 miles. Called dealership and I am one week out of warranty. The cost to fix on is $2000 and requires complete new assembly and reprogram cruise control. Absolutely ridiculous for a daytime running light that burned out. Should be able to replace or offer assistance from VW.

NHTSA ID Number: 11673132
Incident Date: July 12, 2025
Model: 2021 Volkswagen Atlas Cross Sport
Summary: The daytime running lights are already out on a vehicle with less than 50k miles. It is a commonly reported problems with these vehicles and an expensive fix.

NHTSA ID Number: 11675947
Incident Date: July 1, 2025
Model: 2021 Volkswagen Atlas Cross Sport
Summary: One of the daytime running lights has gone out with only 45,000 miles on my vehicle. Dealership says they need to replace the entire headlight assembly, instead of the bulb, at a cost of $1,500. No prior warning as to this issue. There are a number of cases with this same problem at low vehicle mileage.

NHTSA ID Number: 11680524
Incident Date: August 6, 2025
Model: 2021 Volkswagen Atlas

> Summary: Daytime Running Lights went out after 50K miles (warranty is out at this point). To fix this issue VW is requiring to change the whole light fixture, which costs more the $1,000. This is an outrageous expense to fix a single LED strip to support DRLs, and forces drivers to go without lights to avoid paying for it. This issue is VERY common on this model, with multiple online sources/forums with the same experience.

126. Owners and lessees have complained about the DRL issue on social media as well. For instance, in the subreddit r/VWatlas, Reddit users discussed the issue on a thread from 2024:[13]

> Odd_Competition3405: "2022 Atlas. Driver side DRL stopped working. Has anyone experienced this failure and had any resolution other than replacing the entire headlight housing / assembly? I confirmed voltage at the connector. I have not removed the head light and done any further troubleshooting but to my understanding, it is not a serviceable component. If no other options, I will tear down the light and find the cause of failure and document the entire thing for others that experience the issue."

> Tkite: "We had this issue 2 weeks ago with our 2021 Atlas 52k miles. Passenger side led stopped working. Dealer fixed it under extended warranty. This week the drivers side went out. Now they say "oops, not actually covered under warranty". Estimate is $1,800.
> There is another post in the forum describing the same issue with 30+ responses of others encountering the LED outage right around 50k miles.
> Any insight would be appreciated"

> Alone-Dealer-5149: "My drivers side went out at 48k miles and passenger at 52k miles. Warranty is saying its an overheating issue and does not want to cover (currently sitting at Volkswagen)."

---

[13] LED Daytime Running Light Failure, REDDIT (July 4, 2024), https://www.reddit.com/r/VWatlas/comments/1dvgota/led_daytime_running_light_failure/.

> BobcatContent9360: "We have a 2022 Atlas SE. The LED running light went out on our driver's side headlight last week at 68,400 miles. Not paying 1000.00 to replace the headlight assembly. Calling Volkswagen first thing on Monday morning. This is ridiculous to have so many people having the same issue and nothing being done for a resolution to fix the problem. There should be a recall or something."

127. On another Reddit thread in the r/VWatlas subreddit from 2023, users also raised the DRL issue:[14]

> PurpleLegoBrick: "Of course this happens after my warranty expired 4k miles ago but my 2021 Atlas SE with a bit over 50k miles on it had one of its day running lights go out and then a week later the other side went out.
> I went to the dealership and they're saying that it's $2k to replace both assemblies since it isn't just a bulb but the led strip in the headlight that the day running lights use. $2k seems a bit much if I have to do this after around every 50k miles. […]."

> Accomplished-Ebb280: "I have had this problem. I had a 21 Atlas and the exact same thing happened to me. My dealer wanted 1500 each. Too steep. Mine when out at 48k miles. I got a 23 Atlas and because I do a lot of miles for work. Guess what I am at 48k miles and I notice the passenger just went out AGAIN. Which means the driver side strip will go out soon. It is obvious this is a manufacturing fault. Even with my extended warranty they would not fix it. I am not happy with this situation for the second time."

128. As reproduced above, Defendants had knowledge of the numerous complaints to NHTSA and on consumer forums dedicated to Volkswagen ownership, all of which Defendants routinely monitor as part of Defendants' quality control,

---

[14] VW Atlas Headlight Problem, REDDIT (Oct. 11, 2023), https://www.reddit.com/r/VWatlas/comments/175dnsy/vw_atlas_headlight_problem/.

consumer satisfaction, and vehicle performance monitoring processes. Numerous consumer complaints reveal the extent of the danger posed by the Defect.

129. In addition to being on notice of the DRL Defect through NHTSA and other online complaints, Defendants also directly learned of the widespread DRL problems from their network of dealerships. Many of the customers who wrote online or to Defendants about their bad experiences with the Defect report taking their Class Vehicles into Volkswagen dealerships because of the Defect.

130. Defendants also knew of the Defect through rigorous pre-sale testing of the Class Vehicles, which is designed to replicate actual consumer use. Vehicles—particularly premium vehicles like those at issue—undergo significant pre-release testing on all components and systems. Through its pre-sale testing of the Class Vehicles, which includes actual road testing over varying intervals of time, the issues complained of concerning the DRLs necessarily revealed themselves to Defendants, placing Defendants on notice of the Defect.

131. Despite their knowledge of the Defect, Defendants failed to disclose it to Plaintiffs and other Class Members. Defendants could have provided Class Vehicle owners and lessees with adequate and satisfactory notice of the Defect in owners' manuals, on their website, in Class Vehicle brochures and other marketing literature, orally by and through representatives at Defendants' network of

dealerships, and on Class Vehicle Monroney stickers. Had Defendants disclosed the Defect in any of these places, reasonable consumers would have been aware of it.

132. As a consequence of Defendants' actions and inaction, Class Vehicle owners and lessees have been deprived of the benefit of their bargain, subjected to safety risks, suffered damages by having to pay for expensive DRL replacements, and incurred lost time and out-of-pocket costs from dealership visits. Class Vehicles also have suffered a diminution in value due to the Defect.

133. To date, Defendants have offered no solution to the Defect. Considering that the Defect appears to occur most often around the 50,000-mile mark, at which point the New Vehicle Limited Warranty is no longer in effect, Plaintiffs and Class Members often have no choice but to pay out of pocket for an entire headlight assembly, as the DRLs cannot be swapped out individually.

134. Had Plaintiffs and Class Members known about the Defect, they would not have purchased or leased their Class Vehicles or would have paid significantly less.

## **TOLLING OF THE STATUTE OF LIMITATIONS**

135. Because the Defect cannot be detected until it manifests, Plaintiffs and Class Members were not reasonably able to discover the problem until after purchasing or leasing their Class Vehicles, despite exercising due diligence.

136. Defendants failed to disclose that the DRLs are defective. Plaintiffs and Class Members thus had no realistic ability to discover the DRL Defect until the DRLs prematurely failed. Therefore, the discovery rule is applicable to the claims asserted by Plaintiffs and Class Members.

137. As alleged herein, Defendants have known about the Defect for years and have failed to disclose—and actively concealed—the existence of the Defect to consumers. Therefore, equitable tolling of the statute of limitations is also applicable to the claims asserted by Plaintiff and Class Members.

## CLASS ACTION ALLEGATIONS

138. This action is brought and may be maintained as a class action pursuant to Rules 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure on behalf of the following Nationwide Class and state subclasses (collectively, the "Classes"):

> Nationwide Class
> All persons in the United States who bought or leased, other than for resale, any of the following vehicles: 2021–2023 Volkswagen Atlas or Atlas Cross Sport.

139. In addition, or in the alternative, Plaintiffs seek to represent the following state subclasses:

> Georgia Class
> All persons in the State of Georgia who bought or leased, other than for resale, any of the following vehicles: 2021–2023 Volkswagen Atlas or Atlas Cross Sport.

> <u>Virginia Class</u>
> All persons in the Commonwealth of Virginia who bought or leased, other than for resale, any of the following vehicles: 2021–2023 Volkswagen Atlas or Atlas Cross Sport.
>
> <u>Texas Class</u>
> All persons in the State of Texas who bought or leased, other than for resale, any of the following vehicles: 2021–2023 Volkswagen Atlas or Atlas Cross Sport.
>
> <u>Alabama Class</u>
> All persons in the State of Alabama who bought or leased, other than for resale, any of the following vehicles: 2021–2023 Volkswagen Atlas or Atlas Cross Sport.

140. Excluded from the Classes are Defendants, their affiliates, and their officers and directors; persons or entities that purchased the Class Vehicles for resale; and the Judge(s) assigned to this case. Plaintiffs reserve the right to modify, change, or expand the class definitions in light of discovery and/or further investigation.

141. **<u>Numerosity</u>**: The Classes are so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Classes is unknown at this time, as such information is in the sole possession of Defendants and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that hundreds of thousands of Class Vehicles have been sold and leased nationwide and in the states where Plaintiffs reside. Members of the Classes can be readily identified and notified based upon, *inter alia*, the records (including databases, e-mails, and dealership records and files)

maintained by Defendants in connection with the sale and lease of the Class Vehicles.

142. **Predominance of Common Questions of Fact and Law**: Common questions of law and fact exist as to all members of the Classes. These questions predominate over the questions affecting individual Class Members. These common legal and factual questions include, but are not limited to:

- whether Defendants engaged in the conduct alleged herein;
- whether the Class Vehicles are defective;
- whether Defendants placed the Class Vehicles into the stream of commerce in the United States with knowledge of the Defect;
- whether Defendants knew or should have known of the Defect and, if so, for how long;
- when Defendants became aware of the Defect in the Class Vehicles;
- whether Defendants knowingly failed to disclose the existence and cause of the Defect in the Class Vehicles;
- whether Defendants' conduct alleged herein violates consumer protection laws, warranty laws, and other laws as asserted herein;
- whether Plaintiffs and Class Members overpaid for their Class Vehicles as a result of the Defect;

- whether Plaintiffs and Class Members have suffered an ascertainable loss as a result of their loss of their Class Vehicles' features and functionality;
- whether Plaintiffs and Class Members are entitled to damages, including punitive damages, as a result of Defendants' conduct alleged herein and, if so, the amount or proper measure of those damages; and
- whether Plaintiffs and Class Members are entitled to equitable relief, including, but not limited to, restitution and/or injunctive relief.

143. **Typicality**: Plaintiffs' claims are typical of the claims of the Classes because Plaintiffs purchased or leased a Class Vehicle containing the Defect, as did each member of the Classes. Plaintiffs and Class Members were economically injured in the same manner by Defendants' uniform course of conduct alleged herein. Plaintiffs and Class Members have the same or similar claims against Defendants relating to the conduct alleged herein, and the same conduct on the part of Defendants gives rise to all the claims for relief.

144. **Adequacy**: Plaintiffs are adequate representatives of the Classes, whose interests do not conflict with those of any other Class Member. Plaintiffs have retained counsel competent and experienced in complex class action litigation—including consumer fraud and automobile defect class actions—who intend to

prosecute this action vigorously. The interests of the Classes will be fairly and adequately protected by Plaintiffs and their counsel.

145. **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and Class Members. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of these claims, including the need for expert witness testimony on the technical and economic aspects of the case. Individualized litigation also would risk inconsistent or contradictory judgments and increase the delay and expense to all parties and the courts. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

146. **Injunctive Relief**: Defendants have acted, and refused to act, on grounds generally applicable to the Classes, thereby making appropriate final equitable relief with respect to the Classes as a whole.

## CAUSES OF ACTION

### COUNT I
### COMMON LAW FRAUD/FRAUDULENT OMISSION
### (On Behalf of Plaintiffs and the Nationwide Class)

147. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

148. This claim is brought by Plaintiffs on behalf of the Nationwide Class and, additionally or in the alternative, each of the state subclasses.

149. Defendants actively, intentionally, and knowingly concealed, suppressed, and/or omitted material facts, including the existence of the Defect; the standard, quality, or grade of the Vehicles; and the fact that the Vehicles contain a defect and corresponding safety risk, with the intent that Plaintiffs and the Class rely on Defendants' omissions. As a direct result of Defendants' fraudulent conduct, as alleged herein, Plaintiffs and Class Members have suffered actual damages.

150. Defendants knew at the time of sale or lease and thereafter that the Class Vehicles contained the Defect, omitted material information about the safety of the Vehicles, actively concealed the Defect, and never intended to adequately and permanently repair the Defect during the warranty periods. To date, Defendants have not provided Plaintiffs and members of the Class with an adequate repair or remedy for the Defect.

151. Defendants made material omissions concerning a presently existing or past fact. For example, Defendants did not fully and truthfully disclose to its customers the true nature of the inherent Defect. A reasonable consumer would have expected that the DRLs in the Class Vehicles would not fail prematurely and pose a serious safety risk.

152. The facts concealed or not disclosed by Defendants to Plaintiffs and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease Defendants' Class Vehicles or pay a lesser price.

153. Defendants had a duty to disclose the true nature of the Class Vehicles because knowledge of the Defect and its details were known and/or accessible only to Defendants; Defendants had superior and exclusive knowledge and access to the facts; and Defendants knew the facts were not known to, or reasonably discoverable by, Plaintiffs and Class Members. Defendants also had a duty to disclose because they made many general affirmative representations about the qualities of their vehicles, including references as to safety, and general operability, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual performance of the Vehicles.

154. Had Plaintiffs and Class Members known about the defective nature of the Class Vehicles, they would not have purchased or leased the Vehicles or would have paid less for them.

155. As a result, Plaintiffs and the other Class Members were fraudulently induced to lease and/or purchase the Class Vehicles with the said Defect and the resulting safety issues.

156. These misrepresentations and omissions were made by Defendants with knowledge of their falsity and with the intent that Plaintiffs and Class Members rely upon them.

157. Plaintiffs and Class Members reasonably relied on Defendants' misrepresentations and omissions and suffered damages as a result. To the extent that Defendants' conduct was willful, oppressive or malicious, Plaintiffs and Class Members are entitled to an award of punitive damages.

**COUNT II**
**BREACH OF EXPRESS WARRANTY**
**(On Behalf of Plaintiffs and the Nationwide Class)**

158. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herewith.

159. Plaintiffs bring this claim on behalf of the Nationwide Class and, additionally or in the alternative, each of the state subclasses.

160. Defendants are "merchants" as defined under the Uniform Commercial Code ("UCC").

161. The Class Vehicles are "goods" as defined under the UCC.

162. Defendants provided a New Vehicle Limited Warranty that expressly warranted Defendants would repair any defects in materials or workmanship, free of charge, during the applicable warranty periods. Defendants offer similar warranties

on certified used Volkswagens and extended warranties for both new and used vehicles.

163. Defendants breached their express warranty by failing to provide an adequate repair when Plaintiffs and Class Members brought their Class Vehicles to authorized Volkswagen dealerships following manifestation of the Defect.

164. The warranty formed the basis of the bargain reached when Plaintiffs and Class Members purchased or leased their Class Vehicles.

165. Many Class Members experienced the Defect during the warranty period. Despite the existence of the express warranty, Defendants failed to inform Plaintiffs and Class Members that the Class Vehicles were defective and failed to fix the Defect or charged Class Members out of pocket to fix the Defect.

166. The limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because Defendants have failed and/or refused to adequately provide the promised remedies within a reasonable timeframe.

167. As a result of Defendants' actions, Plaintiffs and Class Members have suffered economic damages including, but not limited to, costly repairs, loss of vehicle use, diminished vehicle value, loss of resale value of their Vehicles, and other related damages.

168. Defendants were provided notice of the issues complained of herein by complaints filed against them, dealership visits, direct consumer contacts, pre-suit notification letters, and the instant lawsuit, within a reasonable amount of time.

169. Plaintiffs and Class Members have complied with all obligations under the warranty or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

## COUNT III
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (On Behalf of Plaintiffs and the Nationwide Class)

170. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

171. Plaintiffs bring this claim on behalf of the Nationwide Class and, additionally or in the alternative, each of the state subclasses.

172. Defendants are "merchants" as defined under the UCC.

173. The Class Vehicles are "goods" as defined under the UCC.

174. A warranty that the Class Vehicles were of merchantable quality and condition is implied by law in transactions for the purchase and lease of Class Vehicles. Defendants impliedly warranted that the Class Vehicles were of good and merchantable condition and quality, fit for their ordinary intended use, including with respect to safety, reliability, operability, and substantial freedom from defects.

175. The Class Vehicles, when sold and leased, and at all times thereafter, were not of merchantable quality or condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that the DRLs—a critical safety component of the Class Vehicles—are prone to malfunction and premature failure due to a common defect. The Defect renders the Class Vehicles unmerchantable, as they are unreliable, unsafe, partially or fully inoperable, and not substantially free from defects.

176. Defendants were provided notice of the issues complained of herein by complaints filed against them, dealership visits, direct consumer contacts, pre-suit notification letters, and the instant lawsuit, within a reasonable amount of time.

177. Plaintiffs and Class Members have had sufficient direct dealings with either Defendants or their agents (e.g., dealerships and customer service) to establish privity of contract between Defendants, on the one hand, and Plaintiffs and each of the Class Members, on the other. Nonetheless, privity is not required here because Plaintiffs and each of the Class Members are the intended third-party beneficiaries of contracts between Defendants and their dealers, specifically of Defendants' implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided alongside the Class Vehicles; the warranty agreements were designed for, and intended to, benefit the end-consumers only.

178. As a direct and proximate result of the breach of the implied warranties, Plaintiffs and Class members were injured and are entitled to damages.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Nationwide Class)**

179. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

180. Plaintiffs bring this claim on behalf of the Nationwide Class and, additionally or in the alternative, each of the state subclasses.

181. This claim is pleaded in the alternative to the other claims set forth herein.

182. As the intended and expected result of their conscious wrongdoing, Defendants have profited and benefited from the purchase and lease of Class Vehicles equipped with defective DRLs.

183. Defendants have voluntarily accepted and retained these profits and benefits, with full knowledge and awareness that, as a result of Defendants' misconduct alleged herein, Plaintiffs and the Class Members were not receiving Class Vehicles of the quality, nature, fitness, or value that had been represented by Defendants, and that a reasonable consumer would expect. Specifically, Plaintiffs and the Class Members expected that when they purchased or leased their Class

Vehicles, the Class Vehicles would not contain defective DRLs that failed after only 50,000 miles, requiring replacement of the entire headlight assembly.

184. Defendants have been unjustly enriched by their fraudulent, deceptive, unlawful, and unfair conduct, and by their withholding of benefits and unearned monies from Plaintiffs and the Class Members at the expense of these individuals.

185. Equity and good conscience advise against permitting Defendants to retain these ill-gotten profits and benefits.

**COUNT V**
**VIOLATION OF THE GEORGIA**
**FAIR BUSINESS PRACTICES ACT**
**Ga. Code Ann. § 10-1-390, *et seq.***
**(On Behalf of Plaintiff Greiner and the Georgia Class)**

186. Plaintiff Shawn Greiner incorporates by reference each and every preceding paragraph as though fully set forth herein.

187. Plaintiff Shawn Greiner brings this count on behalf of himself and on behalf of the Georgia Class.

188. Georgia's Fair Business Practices Act ("GFBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful. Ga. Code Ann. § 10-1-393(a).

189. Unfair or deceptive acts or practices are defined to include "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that

goods or services are of a particular standard, quality, or grade … if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised." Ga. Code Ann. § 10-1-393(b).

190. In the course of their business, Defendants made affirmative misrepresentations, and concealed and suppressed material facts, concerning the Class Vehicles. By misrepresenting and failing to disclose that the Class Vehicles contained the Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as reputable manufacturers and distributors that value safety and stood behind their vehicles after they were sold, Defendants engaged in unfair business practices as defined by the GFBPA.

191. Defendants failed to disclose information about the propensity of the Defect to cause DRLs in the Class Vehicles to fail. Further, Defendants knew, or should have known, that inoperable DRLs could cause the Class Vehicles to become involved in collisions or other accidents, putting vehicle operators, passengers, and other motorists at increased risk for injury. Defendants deliberately concealed and failed to disclose this material information to ensure that consumers would purchase the Class Vehicles.

192. Instead, Defendants marketed the Class Vehicles as being safe and reliable transportation, and as being high-quality vehicles, when, if fact, they are not.

193. Defendants violated the GFBPA by: (1) representing the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; and (3) advertising the Class Vehicles with the intent not to sell them as advertised.

194. Defendants engaged in misleading, false, unfair, or deceptive practices, including but not limited to deception, fraud, false pretense, false promise, misrepresentation, and the knowing concealment, suppression, and omission of materials facts concerning the Class Vehicles' Defect and corresponding safety risk in connection with the sale and/or advertisement of Class Vehicles. This includes denying the existence of the Defect to consumers, failing to provide repairs under the express warranty provided with the sale of the Class Vehicles for the Defect, and by presenting themselves as reputable manufacturers that valued safety and stood behind their vehicles after they were sold.

195. Defendants fraudulently, intentionally, negligently and/or recklessly misrepresented to Plaintiff Greiner and members of the Georgia Class the characteristics of Class Vehicles with respect to materials, manufacture, safety, and reliability.

196. Defendants intended that Plaintiff Greiner and members of the Georgia Class would, in the course of their decision to expend money in purchasing, leasing,

and/or repairing Class Vehicles, reasonably rely upon misrepresentations, misleading characterizations, and material omissions concerning the quality of Class Vehicle with respect to materials, workmanship, manufacture, and information in the owner's manuals.

197. Information regarding the Defect as described in this Complaint is material to consumers in that the Defect can cause the DRLs to fail and poses a safety risk.

198. If Defendants had not concealed the Defect from Plaintiff Greiner and members of the Georgia Class within the express warranty period, the Defect would have been repaired without cost to purchasers as promised under the original warranty.

199. Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles' ability to provide safe and reliable transportation with the intent to mislead Plaintiff Greiner and the Georgia Class.

200. Defendants knew or should have known that their conduct violated the GFBPA.

201. Defendants owed Plaintiff Greiner and the Georgia Class a duty to disclose the existence of the Defect and corresponding safety risk because they:

- possessed exclusive knowledge that they were manufacturing, distributing, and selling Vehicles throughout the United States that possessed the Defect;
- intentionally concealed the existence of the Defect from Plaintiff Greiner and the Georgia Class; and
- made incomplete and misleading representations about the Class Vehicles' ability to provide safe and reliable transportation while purposefully withholding material facts that contradicted these representations.

202. As a proximate and direct result of Defendants' unfair and deceptive trade practices, Plaintiff Greiner and members of the Georgia Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm in the form of actual damages in the amount of out-of-pocket expenses in repairing or replacing the defective headlight units, overpaying for defective Class Vehicles, and the diminution of value for the Class Vehicles and other substantial monetary damages and inconvenience.

203. Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the GFBPA. Defendants' violations present a continuing risk to Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

204. Pursuant to statute, Plaintiff Greiner provided notice of the claims by letter dated December 19, 2025. Plaintiff Greiner seeks all damages and relief to which he and the Georgia Class are entitled because Defendants failed to remedy their unlawful conduct within the requisite time period.

205. Plaintiff Greiner and the Georgia Class seek monetary relief against Defendants in the amount of damages, exemplary damages for intentional violations, injunctive relief, attorneys' fees, and any other just and proper relief available under Ga. Code Ann § 10-1-399(a).

## COUNT VI
## VIOLATION OF THE GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT
## Ga. Code Ann. § 10-1-370, *et seq.*
## (On Behalf of Plaintiff Greiner and the Georgia Class)

206. Plaintiff Shawn Greiner incorporates by reference each and every preceding paragraph as though fully set forth herein.

207. Plaintiff Greiner brings this count on behalf of himself and the Georgia Class.

208. The Georgia Uniform Deceptive Trade Practices Act ("GUDTPA") prohibits "deceptive trade practices," which include the misrepresentation of standard or quality of goods or services, and "engag[ing] in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Ga. Code Ann.

§ 10-1-372(a). Defendants engaged in unfair and deceptive practices that violated the GFBPA as described above.

209. Defendants, Plaintiff Greiner, and the members of the Georgia Class are "persons" within the meaning of the GUDTPA, Ga. Code Ann. § 10-1-371(5).

210. Defendants participated in misleading, false, or deceptive practices that violated the GUDTPA. By failing to disclose and actively concealing that the Class Vehicles contained the Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, Defendants engaged in deceptive business practices prohibited by the GUDTPA.

211. In the course of their business, Defendants willfully failed to disclose— and actively concealed—the Defect discussed herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

212. Defendants have known or should have known for years about the Defect in the Class Vehicles but failed to disclose that the Class Vehicles contained the Defect. Defendants also knew they were manufacturing, selling, and distributing

Class Vehicles that did not perform as advertised, and jeopardized the safety of the Vehicle's occupants, but failed to disclose this information to Plaintiff Greiner and members of the Georgia Class. Defendants failed to disclose information about the propensity of the Defect to cause failures in DRL systems. Further, Defendants knew, or should have known, that inoperable DRLs could cause the Class Vehicles to become involved in collisions or other accidents, putting vehicle operators, passengers, and other motorists at increased risk for injury. Defendants deliberately concealed and failed to disclose this material information to ensure that consumers would purchase or lease the Class Vehicles and spend money on useless remedies and repairs.

213. Defendants committed unconscionable, deceptive and unfair trade practices, including, but not limited to, deception, fraud, false pretense, false promise, misrepresentation, and the knowing concealment, suppression, and omission of materials facts concerning the Class Vehicles' Defect and corresponding safety risk in connection with the sale and/or advertisement of Class Vehicles.

214. Defendants fraudulently, intentionally, negligently and/or recklessly misrepresented to Plaintiff Greiner, and members of the Georgia Class the characteristics of the Class Vehicles with respect to materials, manufacture, durability, design, longevity, maintenance, and operating costs.

215. Defendants intended that Plaintiff Greiner, and members of the Georgia Class would, in the course of their decision to expend money in purchasing, leasing and/or repairing Class Vehicles, reasonably rely upon misrepresentations, misleading characterizations and material omissions concerning the quality of Class Vehicle with respect to materials, workmanship, design, manufacture, and information in the owner's manuals.

216. Information regarding the Defect as described in this Complaint is material to consumers in that the Defect results in exorbitant repair or replacement costs and poses a safety risk.

217. If Defendants had not concealed the Defect from Plaintiff Greiner and members of the Georgia Class within the express warranty period, the Defect would have been repaired without cost to purchasers as promised under the original warranty.

218. Defendants violated the GUDTPA by failing to inform Class Vehicle owners prior to purchase and/or during the warranty period that the Class Vehicles are defective.

219. Defendants violated the GUDTPA by failing to inform Class Vehicle owners prior to purchase or lease and/or during the warranty period that the Class Vehicles contained defects and would require replacement of expensive headlight assembly units.

220. As a proximate and direct result of Defendants' unfair and deceptive trade practices, Plaintiff Greiner and members of the Georgia Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm.

221. Plaintiff Greiner and members of the Georgia Class experienced ascertainable losses in the form of actual damages in the amount of the cost to attempt to repair the Defect or replace the headlight assembly unit, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

222. Plaintiff Greiner provided notice of their claims by letter dated December 19, 2025.

223. Plaintiff Greiner and the Georgia Class seek monetary relief against Defendants in the amount of actual damages, injunctive relief, attorneys' fees, and any other just and proper relief available under Ga. Code Ann. § 10-1-373.

## COUNT VII
## VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT
## Tex. Bus. & Com. Code §§ 17.41, *et seq.*
## (On Behalf of Plaintiffs Gonzalez, Langham, Glenn and the Texas Class)

224. Plaintiffs Apryl Gonzalez, Lydia Langham, and Jared Glenn ("Texas Plaintiffs") incorporate by reference each and every preceding paragraph of this Complaint as though fully set forth herein.

225. Texas Plaintiffs are "consumers" within the meaning of Tex. Bus. & Com. Code § 17.45(4) because they sought and acquired goods—namely, a Class Vehicle—by purchase for personal, family, or household use. The Class Vehicles purchased by Texas Plaintiffs constitute "goods" within the meaning of the Texas Deceptive Trade Practices Act ("TDTPA"). Defendants are "persons" under Tex. Bus. & Com. Code § 17.45(3) and are engaged in trade and commerce as defined by the statute.

226. The TDTPA prohibits the use or employment of any false, misleading, or deceptive acts or practices in the conduct of trade or commerce. Tex. Bus. & Com. Code § 17.50(a)(1).

227. In connection with the marketing, advertising, and sale of the Class Vehicles, Defendants engaged in false, misleading, and deceptive acts and practices, including but not limited to: (i) representing that the Class Vehicles have characteristics, uses, benefits, or qualities that they do not have; (ii) representing that the Class Vehicles are of a particular standard, quality, or grade when they are of another; and (iii) failing to disclose material information concerning the Class Vehicles with the intent to induce consumers into transactions they otherwise would not have entered.

228. Defendants affirmatively represented to consumers, including Texas Plaintiffs, that the Class Vehicles were safe, reliable, durable, and of high quality, and that their safety systems—including DRLs—would perform as expected.

229. These representations were false, misleading, and deceptive when made because, at the time of sale, the Class Vehicles were equipped with a latent defect in the LED DRL system that causes premature failure and creates a safety hazard.

230. Defendants also engaged in deceptive acts by failing to disclose material facts, including: (i) that the DRLs are prone to premature failure at approximately 45,000–60,000 miles; (ii) that failure of the DRLs requires replacement of the entire headlight assembly at significant cost; (iii) that the Defect diminishes vehicle visibility and poses a safety risk; and (iv) that Defendants knew of the Defect prior to sale through testing, consumer complaints, warranty data, and dealership information.

231. Defendants' failure to disclose these material facts satisfies the elements of a TDTPA omission claim because Defendants failed to disclose material information, which was known to Defendants at the time of the transaction, with the intention to induce Texas Plaintiffs to enter into the transactions and Texas Plaintiffs would not have purchased the Class Vehicles, or would have paid less, had the information been disclosed.

232. Defendants had a duty to disclose the Defect and its associated risks because: (i) Defendants possessed superior and exclusive knowledge of the Defect; (ii) the Defect implicates vehicle safety by reducing visibility and increasing crash risk; and (iii) Defendants made partial representations regarding safety, reliability, and quality that were misleading absent full disclosure.

233. Texas Plaintiffs relied on Defendants' representations and omissions in deciding to purchase their Class Vehicles. Had Defendants disclosed the true nature of the DRL Defect, Texas Plaintiffs would not have purchased the Class Vehicles or would have paid substantially less for it.

234. As a direct and proximate result of Defendants' conduct, Texas Plaintiffs and members of the Texas Class suffered damages, including but not limited to: the cost to attempt to repair the Defect or replace the headlight assembly unit; diminution of Class Vehicle resale value; increased repair and maintenance costs; and other substantial monetary damages and inconvenience. Defendants' unlawful conduct caused these damages.

235. Defendants acted knowingly, as defined by Tex. Bus. & Com. Code § 17.45(9), because they were aware of the falsity, deception, and unfairness of their conduct.

236. Pursuant to Tex. Bus. & Com. Code § 17.50, Texas Plaintiffs and the Texas Class are entitled to all remedies available under the TDTPA, including

monetary relief in the amount of actual damages, injunctive relief, attorneys' fees, and any other just and proper relief available under the TDTPA.

**COUNT VIII**
**VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT**
**Va. Code Ann. §§ 59.1-196, *et seq.***
**(On Behalf of Plaintiffs A. Johns and C. Johns and the Virginia Class)**

237. Plaintiffs Anna Johns and Charles Johns ("Virginia Plaintiffs") incorporate by reference each and every preceding paragraph of this Complaint as though fully set forth herein.

238. The Virginia Consumer Protection Act ("VCPA") prohibits suppliers from using any deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction.

239. The VCPA prohibits certain "fraudulent acts or practices committed by a supplier in connection with a consumer transaction," including "[m]isrepresenting that goods … are of a particular standard [or] quality" or "have certain characteristics, uses, benefits, or qualities" that they do not have. VCPA § 59.1-200(A)(5)-(6). The VCPA also prohibits the use of "any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction." VCPA § 59.1-200(A)(14).

240. Defendants, Plaintiffs Anna Johns and Charles Johns, and the members of the Virginia Class are "persons" within the meaning of the VCPA. VCPA § 59.1-

198. Defendants are "suppliers" within the meaning of Va. Code Ann. § 59.1-198 because they advertise, market, distribute, and sell motor vehicles to consumers, including within the Commonwealth of Virginia. The purchase of the Class Vehicle by the Virginia Plaintiffs constitutes a "consumer transaction" within the meaning of the VCPA.

241. In connection with the marketing, advertising, and sale of the Class Vehicles, Defendants made uniform representations to consumers—including the Virginia Plaintiffs—that the Class Vehicles were safe, reliable, durable, and of high quality, and that their components, including safety features such as DRLs, would perform as expected.

242. These representations were false and misleading when made because, at the time of sale, the Class Vehicles contained a latent defect in the LED DRL system that causes premature failure and creates a safety risk, as alleged herein.

243. In addition to affirmative misrepresentations, Defendants omitted and concealed material facts, including: (i) that the DRLs in the Class Vehicles were prone to premature failure at approximately 45,000–60,000 miles; (ii) that the DRLs are such that failure of a single LED component would require replacement of the entire headlight assembly at significant cost; (iii) that the Defect poses a safety risk by reducing vehicle visibility; and (iv) that Defendants were aware of the Defect prior to sale through pre-sale testing, consumer complaints, warranty data, and

dealership reports. These omissions rendered Defendants' affirmative statements misleading and incomplete.

244. Defendants' statements and omissions concern present or pre-existing facts—namely, the true condition, quality, durability, and safety of the Class Vehicles at the time of sale—not merely future promises.

245. Defendants knew or should have known, at the time of sale, that the Class Vehicles were defective and that their representations regarding safety, reliability, and quality were false or misleading.

246. Defendants nevertheless made these representations and omissions with the intent that consumers, including the Virginia Plaintiffs, would rely upon them in deciding whether to purchase or lease the Class Vehicles.

247. Defendants further intended to induce consumers to pay a premium price for the Class Vehicles based on their purported safety and reliability.

248. The Virginia Plaintiffs reasonably relied on Defendants' representations and omissions in deciding to purchase their Class Vehicle. Specifically, the Virginia Plaintiffs: (i) reviewed and were exposed to Defendants' marketing, advertising, and dealership representations concerning the safety, reliability, and quality of the Class Vehicle; (ii) interacted with Defendants' authorized dealership in Virginia at the time of purchase; and (iii) relied on these representations and the absence of any

disclosure of a defect in concluding that the Class Vehicle was safe and reliable and worth the purchase price.

249. Had Defendants disclosed the true nature of the Defect, the Virginia Plaintiffs would not have purchased the Class Vehicle or would have paid substantially less for it.

250. As a direct and proximate result of Defendants' misrepresentations and omissions, the Virginia Plaintiffs and members of the Virginia Class suffered ascertainable losses, including but not limited to: the cost to attempt to repair the Defect or replace the headlight assembly unit; diminution of Class Vehicle resale value; increased repair and maintenance costs; and other substantial monetary damages and inconvenience. Defendants' unlawful conduct caused of these damages.

251. Defendants' violations were knowing and willful, entitling the Virginia Plaintiffs and the Virginia Class to enhanced statutory damages.

252. Pursuant to Va. Code Ann. § 59.1-204, the Virginia Plaintiffs and the Virginia Class seek monetary relief against Defendants in the amount of actual damages, injunctive relief, attorneys' fees, and any other just and proper relief available under the VCPA.

## COUNT IX
## VIOLATION OF THE ALABAMA DECEPTIVE TRADE PRACTICES ACT
## Ala. Code § 8-19-1, *et seq.*
## (On Behalf of Plaintiff Wynn and the Alabama Class)

253. Plaintiff Paul Wynn incorporates by reference each and every preceding paragraph of this Complaint as though fully set forth herein.

254. Plaintiff Wynn brings this count individually and on behalf of the Alabama Class under the Alabama Deceptive Trade Practices Act ("ADTPA"), Ala. Code § 8-19-1, *et seq.*

255. Plaintiff Wynn and members of the Alabama Class are "consumers" within the meaning of Ala. Code § 8-19-3(2) because they purchased or leased goods, namely the Class Vehicles, for personal, family, or household purposes. Defendants are "persons" within the meaning of Ala. Code § 8-19-3(5) and were engaged in "trade or commerce" within the meaning of Ala. Code § 8-19-3(8).

256. The ADTPA prohibits deceptive acts or practices in the conduct of trade or commerce, including "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have," Ala. Code § 8-19-5(5), "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another," Ala. Code § 8-19-5(7), and "[e]ngaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce," Ala. Code § 8-19-5(27).

257. In connection with the marketing, advertising, distribution, sale, and lease of the Class Vehicles, Defendants represented to Plaintiff Wynn and members of the Alabama Class that the Class Vehicles were safe, reliable, durable, and of high quality, and that their components, including safety features such as DRLs, would perform as expected.

258. These representations were false, misleading, and deceptive when made because, at the time of sale or lease, the Class Vehicles contained a latent defect in the LED DRL system that causes the DRLs to fail prematurely, often at or near the expiration of the New Vehicle Limited Warranty, and requires replacement of the entire headlight assembly at substantial cost.

259. Defendants also omitted and concealed material facts from Plaintiff Wynn and members of the Alabama Class, including that: (i) the DRLs in the Class Vehicles were prone to premature failure; (ii) the DRLs were integrated into the headlight assembly and were not separately serviceable; (iii) failure of the DRLs would require replacement of the entire headlight assembly at significant cost; (iv) DRL failure reduces vehicle visibility and creates a safety risk; and (v) Defendants knew of the Defect before and during the sale or lease of the Class Vehicles through pre-sale testing, consumer complaints, NHTSA complaints, warranty data, dealership reports, and other internal sources of information.

260. Defendants had knowledge of the false, misleading, and deceptive nature of their conduct. Defendants knew, or at minimum had superior and exclusive knowledge, that the Class Vehicles suffered from the Defect, that the Defect was material to reasonable consumers, and that Plaintiff Wynn and members of the Alabama Class would not reasonably discover the Defect before purchase or lease.

261. Defendants' omissions rendered their affirmative representations regarding the safety, reliability, durability, and quality of the Class Vehicles misleading and incomplete. Defendants' concealment and suppression of the Defect also constituted a false, misleading, or deceptive act or practice under Ala. Code § 8-19-5(27).

262. Defendants intended that Plaintiff Wynn and members of the Alabama Class would rely on their representations and omissions in deciding to purchase or lease their Class Vehicles. Plaintiff Wynn and members of the Alabama Class did reasonably rely on Defendants' representations and omissions, including Defendants' representations that the Class Vehicles were safe, reliable, durable, and of high quality, and their failure to disclose the known DRL Defect.

263. The information Defendants misrepresented, concealed, and omitted was material. A reasonable consumer would consider the existence of a latent defect in a safety-related lighting system important in deciding whether to purchase or lease

a vehicle, how much to pay for it, and whether to purchase, lease, or continue using the vehicle.

264. Had Defendants disclosed the Defect before Plaintiff Wynn and members of the Alabama Class purchased or leased their Class Vehicles, they would not have purchased or leased their vehicles or would have paid less for them.

265. As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiff Wynn and members of the Alabama Class suffered monetary damages, including overpayment for their Class Vehicles, diminution in value, loss of the benefit of the bargain, out-of-pocket expenses, diagnostic and repair-related costs, loss of use, and other damages arising from the Defect.

266. Plaintiff Wynn and members of the Alabama Class seek all relief available under Ala. Code § 8-19-10, including actual damages or statutory damages, treble damages in the Court's discretion, injunctive relief, costs, reasonable attorneys' fees, and all other relief the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all other similarly situated, hereby request that this Court enter an Order against Defendants providing for the following:

A. Certification of the proposed Nationwide Class and/or each of the state subclasses, appointment of Plaintiffs and their counsel to represent the Classes, and provision of notice to the Classes;

B. An order permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C. Injunctive relief in the form of a recall;

D. Costs, restitution, and damages, including punitive damages, penalties, and disgorgement in an amount to be determined at trial;

E. An order requiring Defendants to pay pre- and post-judgment interest on any amounts awarded, as provided by law;

F. An award of reasonable attorneys' fees and costs as permitted by law; and

G. Such other or further relief as may be appropriate.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury for all claims so triable.

Date: July 21, 2026

Respectfully submitted,

*/s/ Andrew W. Ferich*

Andrew W. Ferich
(NJ Bar No. 015052012)
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, Pennsylvania 19087
Telephone: (310) 474-9111
Facsimile: (310) 474-8585
aferich@ahdootwolfson.com

Sarper Unal (*pro hac vice* forthcoming)

**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, California 91505
Telephone: (310) 474-9111
Facsimile: (310) 474-8585
sunal@ahdootwolfson.com

Gary M. Klinger
(*pro hac vice* forthcoming)
William J. Edelman
(*pro hac vice* forthcoming)
**MILBERG LLC**
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
Telephone: (866) 252-0878
gklinger@milberg.com
wedelman@milberg.com

*Counsel for Plaintiffs and the Proposed Classes*

**CERTIFICATION PURSUANT LOCAL CIVIL RULE 11.2**

Pursuant to L. Civ. R. 11.2, I hereby certify that to the best of my knowledge the matter in controversy is not the subject of any other action pending in any court or the subject of a pending arbitration proceeding, nor is any other action or arbitration proceeding contemplated.

I further certify that I know of no party, other than putative class members, who should be joined in the action at this time.

Date: July 21, 2026

*/s/ Andrew W. Ferich*
Andrew W. Ferich
(NJ Bar No. 015052012)